## Easton, Appellant, *v.* Elk Tanning Company.

Argued October 25, 1937.

Before KELLER, P. J., CUNNINGHAM, BALD-RIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Paul Cauffiel,* with him *W. F. DuBois* and *Chester A. Ashton,* for appellant.

*G. Mason Owlett,* with him *James S. Berger* and *Chas. G. Webb,* for appellee.

OPINION BY CUNNINGHAM, J., December 17, 1937:

Upon the application of Nellie E. Easton, widow of Howard Easton and acting on behalf of herself and their seven dependent children, we permitted this appeal to be presented in forma pauperis. By it we are called upon to decide whether the court below erred in holding that an award of compensation for the death of her husband (made to her and the guardian of the children by the referee and affirmed by the board) was not supported by the evidence.

In disposing of this case the common pleas did not, as argued by counsel for appellant, weigh the evidence and change the findings of fact made by the compensation authorities. In the opinion filed by LEWIS, P. J., it was held that the finding of fact by the referee (adopted by the board), upon which the compensation authorities based their conclusion that Easton's death was compensable, was, as a matter of law, not supported by competent evidence and that the law had not been properly applied to the facts disclosed by the record. The order appealed from is, in effect, a judgment in favor of the defendant employer.

There is little, if any, conflict in the testimony; the controversies relate to the inferences to be drawn from

it. Appellant's husband died on September 17, 1931, in the Blossburg State Hospital. It is beyond question that the immediate cause of his death was a hemorrhage from a large artery in his left chest, which had become necrosed by a streptococcic infection. When admitted to the hospital several weeks prior to his death, decedent had a high temperature and the presence of the infection was manifested by a swollen condition of the left shoulder and axilla and a lump over his heart.

Contending that her husband's death had resulted from "an accident in the course of his employment" with the Elk Tanning Company, appellant instituted appropriate proceedings under the Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS Sections 431 and 411. In its answer to the claim petition the employer denied that decedent's death was caused by any injury suffered by him while in its employ; appellant therefore had the burden of proving that her husband's death was compensable under the provisions of the statute.

Two hearings were had before a referee. Material facts appearing from the uncontroverted testimony may be thus summarized: Easton was a strong, healthy man and had worked regularly for the defendant company as a laborer for some three years prior to his fatal illness. In the claim petition his employment was described as "hoisting packs in scrub house" and the evidence shows he had been engaged in that work for at least three or four months. From the testimony of his foreman and fellow employees we gather that decedent worked in the scrub house of defendant's tannery; that his work was the hoisting of wet leather "after it was tanned and ready to be finished" out of baths and placing it in revolving wheels to be washed. While doing this work his hands necessarily and constantly came in contact with a tannery liquid. An excerpt from the testimony of the foreman reads: "Q. His work required

him to handle these hides in the process of tanning?
A. He handled leather after it was tanned, ready to be finished. Q. Was it wet working there? A. Yes. Q. Water around there? A. Yes. Q. The job was known as a wet job? A. Yes." It is also clear from the testimony that the tannery liquid with which decedent and his fellow employees came in contact not infrequently caused cracks to appear upon their fingers and hands. Appellant testified that for some weeks prior to his illness decedent complained of a crack on his left index finger.

Edwin Victor, a fellow employee who had worked with decedent for three months, testified "he (the decedent) had a cracked finger for quite a while ...... [and] had a sore on one thumb for quite a while." The witness stated his own hands "never bothered [him] much," but added that "some people's crack worse than others." Harry Reedy, another employee, testified decedent had a sore on his finger. Joseph Golden, decedent's foreman, testified he had seen decedent every day and "on numerous different occasions" had observed "scratches or cracks on his hands."

When decedent was obliged to quit work he was treated for a few days at his home by Dr. F. G. Reese and then removed to the hospital where he came under the care of Dr. L. G. Cole.

Obviously, this is not a case in which there was such an unbroken sequence of events as would justify the conclusion, without the aid of expert testimony, that there was a causal connection between the happening of some event (for instance, the running of a splinter of brass into a hand, as in *Loeffler v. Western Elec. Co.*, 107 Pa. Superior Ct. 326, 163 A. 322, or a fall, as in *Flour v. Penna. R. R. Co.*, 99 Pa. Superior Ct. 170,) and the death of a workman. It was therefore necessary in this case for appellant to show a connection between the happening of some event, amounting to

an "accident" in the course of her husband's employment, and his death. This she undertook to do by the testimony of Dr. Cole. The referee, as a part of his fifth finding of fact, stated Easton died "from a streptococcic infection of the blood stream, . . . . . . due to a septic poisoning which he contracted on or about August 25, 1931, *through the sore or crack which he had on the index finger of his left hand,* which he received in the handling of the wet hides." (Italics supplied) It was upon this finding that the referee and board based the conclusion of law that the death was compensable. It may be noted in passing that the evidence to which we have referred establishes that decedent was not handling "hides," but "leather after it was tanned, ready to be finished."

The primary question involved upon this appeal is whether there was any competent evidence supporting the finding that the infection entered the blood stream of the decedent "through the sore or crack which he had on the index finger of his left hand." Even if the testimony warranted the inference that the streptococcic germ did enter through the crack in decedent's finger, we still have the important question whether it entered by reason of any "accident in the course of his employment."

Dr. Cole did not clearly express an opinion even that the crack in decedent's hand was most probably the "site of entrance" of the germ. He did testify that in the course of the history given by the decedent at the hospital reference was made to cracks on his left hand, but no information was given him with reference to the time "of the formation of these cracks," and the doctor also stated he had observed the cracks upon making his examination of the patient. When asked upon cross-examination upon what finger the cracks were found the witness replied: "I think the left index, if I remember, and also some blisters in the palm of

the hand." This is the only reference made by Dr. Cole to blisters. If we assume that his recollection about the existence of blisters is correct, there is nothing in the testimony to indicate that they were there prior to decedent's admission to the hospital. The statement of appellant was to the effect that there were no blisters upon his hands when he was taken ill. An excerpt from her testimony reads: "Q. Just before he was taken ill, what was the condition of his fingers and hands—that is, just explain to the referee how they were? A. He complained about his fingers hurting and paining. Q. What would you say about them—about cracks and blisters? A. Just his finger here (index), I noticed was cracked and pained him all the time."

As to the cause of death Dr. Cole stated positively it was a second hemorrhage "due to the necrosis of the axillary veins. This severe hemorrhage, connected with the severe streptococcic infection, was the cause of his death." The witness made reference to the fact that there was no swelling of the decedent's left hand or wrist and explained that infection of the type here involved frequently spreads through the lymphatics. The most material portion of his testimony reads: "Q. Will you explain the nature of the infection through the lymphatics. Just explain on the record how these infections develop. A. That is taken up from the lymphatics, in this case of the palmar surface of the hand, and, of course, that follows up the arm, a chain of them, and centralizes in the axilla space. Of course, these lymphatic areas will drain from the breast, chest wall and forearm and infection come up the arm. Very common to centralize, and then when it becomes a blood stream infection—systemic affair, it is usually not difficult to prove by bacteria examination of the blood, whether there is or is not a blood stream infection, which we showed in our laboratory that this man had a streptococcic infection of the blood stream. Q. The

542

fact that there was no pronounced swelling in the hand and forearm is not an unusual case in cases of this kind? A. No, sir, doesn't mean anything. Q. In other words, the infection in the hand *might* show up in the axilla or the chest without any indication from the hand itself or the forearm? A. *Or from the site of entrance.* Q. In other words, it gets in the lymphatic glands and follows up and is more liable to develop under the arm? A. Yes—centralization." (Italics supplied)

One difficulty with this testimony is that the witness was not asked point blank whether in his opinion the infection in this case had entered through the crack in the finger, but was asked the general question, "how these infections develop." The only reference in his answer to the present case was the phrase, "that infection is taken up from the lymphatics, *in this case of the palmar surface of the hand.*" It is significant that no specific reference was made by the witness to the cracks in the patient's finger or thumb. In a succeeding question reference was made to the hand and the doctor was asked whether an infection "in the hand might show up in the axilla or the chest without any indication from the hand itself or the forearm"; to this inquiry he gave the rather cryptic answer, "Or from the site of entrance." We are unable to see that this testimony amounts to an expression by the witness of his professional opinion that "the site of entrance" was the "sore or crack which he had on the index finger of his left hand," as found by the referee.

On the whole, we think this testimony falls short of the standard prescribed by the Supreme Court in *Fink v. Sheldon Axle & Spring Co.,* 270 Pa. 476, 479, 113 A. 666, which is that it is not enough for experts to say simply that a death in question might have resulted from an assigned cause, or that the one could have brought about the other; "they must go further and

testify at least that, taking into consideration all the attending data, it is their professional opinion the result in question most probably came from the cause alleged."

An excerpt from the testimony of Dr. Reese, who attended decedent before he was taken to the hospital, reads: "Q. In your experience, doctor, is it always possible when a person has that blood infection, to tell just where the infection entered the system? A. I would say no. Q. You have known of cases where a man died of such blood infection where you could find no sores or any point of infection? A. Yes."

But giving appellant the benefit of every possible doubt and assuming that the testimony of Dr. Cole would support an inference that the germ entered through the crack upon decedent's finger, we still have the question whether there is any evidence that its entry was brought about by any "accident," occurring while he was "in the course of his employment." For aught that appears in the testimony, it may have entered while he was absent from the premises of his employer and engaged in activities having no connection with the furtherance of its business or affairs.

Moreover, we find no evidence upon this record of any abrupt or unforeseen external or internal violence to the physical structure of decedent's body or any untoward or unexpected occurrence aside from the usual course of events. We are dealing in this case with a death from a germ disease. Whether such disease develops from germs within the body or entering from without, the resulting death is not compensable in the absence of proof of an "accident" within the meaning of the statute. In *Micale v. Light & S. W. Ins. Fund,* 105 Pa. Superior Ct. 399, 161 A. 600, the decedent, a coal miner, died of pneumonia. He had worked for a month in a portion of the mine which was uniformly and continuously wet. In affirming a disallowance of compen-

sation KELLER,. J., (now President Judge) citing *McCauley v. Imperial W. Co. et al.*, 261 Pa. 312, 328, 104 A. 617, and other cases, pointed out that a death from a germ infection in order to be compensable must be shown to have been a sudden development from some abrupt violence to the physical structure of the body, and not merely the result of a gradual development from long continued exposure to natural dangers incident to the employment.

The opinion of our Supreme Court in *Lacey v. Washburn & Williams*, 309 Pa. 574, 164 A. 724, contains a comprehensive discussion of the subject with which we are now concerned. There, the decedent had exposed himself for an hour to a very low temperature in the refrigerating room of an ice cream company and died as the result of pneumonia contracted at that time. It was held that the chill from which the death resulted was not the consequence of a sudden and unexpected event which took place without expectation, a mere chance or contingency, but the natural and usual consequence of the decedent's entering and remaining so long in such a place. It is perfectly clear from the testimony in this case that the sores upon the decedent's hand were not caused by any sudden or unexpected event, nor were they an unusual result from a known cause; they were the natural and usual incidents of the kind of work in which decedent was engaged.

In the next place counsel for appellant argue that "the penetration of the deadly streptococcus germ" was "the real compensable accident," i. e., the "injury" upon which any and every claim for compensation must be predicated.

The legislature has not left us in doubt concerning the sense in which the word "injury" is used in the statute; it said: "The terms 'injury' and 'personal injury' as used in this act shall be construed to mean

only violence to the physical structure of the body, and such disease or infection as naturally results therefrom; and wherever death is mentioned as a cause for compensation under this act, it shall mean only death resulting from such violence and its resultant effects."

The appellate decisions cited and relied upon in behalf of appellant do not sustain their contention; in each there was evidence of an unexpected and untoward happening, a mishap, causing actual violence to some part of the body and creating a port of entry for the germ.

Emphasis was laid at the argument upon the case of *McCauley v. Imperial W. Co.,* supra,—the anthrax case. There the cause of death was anthrax, primarily a disease of animals which may be transmitted to human beings when handling infected animal materials, like wool. The disease is caused by the entrance of anthrax bacilli into the human body and their rapid multiplication and development. In the majority of cases the inoculation which causes external anthrax occurs through a scratch or an abrasion of the skin. The evidence in the case established that when McCauley went to work one morning he was perfectly well and had no abrasion or mark upon his neck, but when he left the defendant's plant in the afternoon there was a "little scratch" or abrasion "about the size of a dime" on his neck which caused a swelling; and that this was the beginning of the external anthrax from which he died. The violence to the physical structure of the body shown in that case was that McCauley was accidentally struck during the day with one of the "stickers" in the wool which he was carrying.

In *Johnston v. Payne-Yost C. Co. et al.,* 292 Pa. 509, 141 A. 481, the cause of death was infection through a burn upon the nose of the employe, accidentally received while at work. The injury there was the burn.

In our case of *Piotrowski v. T. O. Dey & Co. et al.,*

123 Pa. Superior Ct. 29, 185 A. 862, also cited in behalf of appellant, the decedent accidentally cut her finger and death resulted from streptococcic septicemia directly resulting from the injury to her finger. In the recent case of *Broad St. Tr. Co. v. Heyl Bros. et al.*, 128 Pa. Superior Ct. 65, 193 A. 397, the deceased accidentally cut his thumb while handling a barrel in the plant of his employer.

Finally, it is contended on behalf of appellant that the court below should have remitted the record to the board for further hearing and determination as provided in Section 427 of the statute as amended by the Act of June 26, 1919, P. L. 642, 77 PS §879.

As already stated, the court turned the case upon a matter of law—the absence of any legally competent evidence supporting the conclusion of the compensation authorities. There is nothing upon the record indicating that anything was omitted which could have been shown (Cf. *McGrath v. Herzog et al.*, 126 Pa. Superior Ct. 229, 190 A. 550), nor do counsel assert they have any additional evidence.

The suggestion that the record be returned to the board is without the slightest merit. The case has already been delayed entirely too long, but through no fault upon the part of the court below. Although the hearings began before the referee in July, 1932, the case was not argued and submitted to the common pleas until February, 1937. The final order of that tribunal was entered within fifteen days after the argument.

The plight of appellant and her young children appeals to our sympathies, but we find ourselves unable, even under the most liberal construction of the statute, to sustain any of her assignments of error.

Order affirmed.